## 21009

F. GREGORIE & SON, Esther Gregorie, Mary Ollston Gregorie, Sarah Gregorie Muller, Ferdinand Gregorie, Jr., Elizabeth Gregorie Penerwill, Ann Gregorie Greene, and Julian Weaver Gray, Respondents, v. Osgood D. HAMLIN, Esther Royall Gray Swain, Sarah Windon Gray Mills and John Everett Gray, The Last Two Named Being Minors Over the Age of Fourteen Years, Defendants. APPEAL OF Osgood D. HAMLIN.

(257 S. E. (2d) 699)

---

[1] This view is in accord with that of the Attorney General. See 1975-76 Op.Atty.Gen. No. 4552, p. 423.

*Jack White* and *Fred G. Scott, Jr.,* Charleston, and *Lewis, Lewis & Robinson,* Columbia, *for appellant.*

*Holmes, Thomson, Logan & Cantrell,* Charleston, *for respondents.*

July 24, 1979.

*Per Curiam:*

This case is on appeal before us because the Honorable Paul Moore, circuit judge, granted a summary judgment in favor of the plaintiffs. His order sets forth and properly disposes of all the issues submitted to this court. Let that order be printed as our directive.

NESS, J., dissents.

## ORDER OF JUDGE PAUL MOORE

This matter comes before me to be heard on Monday, June 12th, 1978, on Motion of the Plaintiff for Partial Summary Judgment declaring a deed, absolute on its face, an equitable mortgage. The Plaintiff was represented by the firm of Holmes, Thomson, Logan & Cantrell, and the Defendant was represented by Fred B. Scott, Esquire and Jack White, Esquire.

The controversy over which the litigant parties argue can be summarized as a dispute as to whether a deed, absolute on its face accompanied by grantee's contemporaneous agreement to re-convey on payment of a stated sum of money within a given time period, was intended as a mortgage. Stated differently the question would be whether or not the document and accompanying agreement was intended as a deed absolute, convey the fee and the Plaintiff's equity of redemption or was it intended as security for a debt and hence as a mortgage.

I have fully considered all pleadings filed in this case together with the depositions of O. D. Hamlin, taken on April 20th, 1976 and on August 26th, 1976; an affidavit of W. H. Brockinton, Jr. dated October 18, 1977, (Mr. Brockinton being the attorney who prepared the documents in dispute in this litigation), and the affidavit of Osgood D. Hamlin, dated June 5th, 1978.

## FACTS

The property in question is approximately 601.17 acres of land located in Mount Pleasant, South Carolina, known as "OAKLAND" Plantation, which is the longtime Gregorie family home place. In the late 1950's and early 1960's the oil distributorship known as F. Gregorie & Son which was owned and operated by members of the Gregorie family, was experiencing financial difficulty, such economic problems apparently being fairly well known throughout the financial community in the County of Charleston. The company was having particular difficulty with two of its suppliers, to wit: Arkansas Fuel Oil Corporation of Shreveport, Louisiana, and Carolina Fleets, Inc. of Anderson, South Carolina.

The Plaintiff in this action, Osgood D. Hamlin, was a neighboring landowner, kinsman, and longtime friend of the Gregorie family; apparently was particularly close to the elder Mr. Ferd Gregorie. Beginning approximately in the mid-1950's, Hamlin had loaned money to that business at the request of Ferd Gregorie, Sr. In addition, Hamlin co-signed a promissory note held by Arkansas Fuel Oil Corporation in the principal amount of Thirty Thousand ($30,-000.00) Dollars, he being the one promisor thereon at that point financially responsible.

During approximately the same time, Ferd Gregorie, Sr., suffering from ill health, turned the operation of the business over to Ferdinand Gregorie, Jr., hereinafter referred to as "Gregorie."

The status of affairs in late October, early November 1960 was that Arkansas Fuel Oil Corporation and Carolina Fleets Inc. (City Services), together with a number of other, smaller creditors, were pressing for collections upon their respective debts.

The subject deed and re-purchase agreement were executed on January 31, 1961, the deed however was held un-

recorded until March 2, 1963, at which time it was recorded in Book U-78 at Page 66 in the R. M. C. Office for Charleston County.

The debt with Arkansas Fuel Oil Corporation and City Services was a continuing one and in late January 1961, both companies still had outstanding promissory notes. As a result from continuous pressure by these two major creditors, attempts were made to sell the business of F. Gregorie & Son. Failing this, the First National Bank of South Carolina was approached with the proposal that sufficient monies to pay these debts be loaned by the Bank, the repayment of said monies to be secured by a first mortgage on "OAK-LAND" Plantation. Both Hamlin and Gregorie were involved in the discussions with the First National Bank relative to this loan. As a result of these discussions with the Bank, a note and mortgage were executed on January 26, 1961 by Ferdinand Gregorie, Sr., in favor of the First National Bank of South Carolina in the amount of Thirty-Five Thousand ($35,000.00) Dollars. The note but not the mortgage was guaranteed by Hamlin. On this same date, the deed, purporting to convey "OAKLAND" Plantation was executed by Ferdinand Gregorie, Sr., to O. D. Hamlin, the consideration being stated as follows: "assumption of balance due on note of Ferdinand Gregorie to the First National Bank of South Carolina as hereinbelow set forth and the sum of Five ($5.00) Dollars."

In addition to this deed, a re-purchase agreement was executed between F. Gregorie, Jr., as agent for F. Gregorie Sr. and O. D. Hamlin on January 31, 1961.

The amount of money necessary to pay off both Arkansas Fuel Oil Corporation and City Services at this time was determined to be Thirty-Nine Thousand Seven Hundred Ninety-One and 68/100 ($39,791.68) Dollars, the said debts being paid to both companies from the proceeds received from the first mortgage on "OAKLAND" Plantation obtained from the First National Bank, together with a further advance from Hamlin himself.

In addition, another mortgage was executed on behalf of F. Gregorie & Son as well as on behalf of Ferd Gregorie, Sr., and F. Gregorie, Jr.; said mortgage was executed in favor of O. D. Hamlin in the amount of Thirty-Five Thousand ($35,000.00) Dollars, on January 31, 1961, (but was held unrecorded until March 31, 1966, where upon it was recorded in Book F-85 at Page 269 in the R. M. C. Office for Charleston County). Security for this mortgage was both real estate and rolling stock of the business, F. Gregorie & Son.

Rule 44 places upon me the duty of determining the unquestioned facts before the Court based upon affidavits and instruments, and I am under very strict limitations. Two particular principles have governed my sifting of the facts. First, I consider the deed and the memorandum of agreement attached to the Complaint as part and parcel of the same transaction. Second, I must search for the intention of the parties at the time of the transaction and not as any of them may interpret their intentions at this time.

With the above restrictions in mind, I therefore find that the evidence available to me under the strict rules for summary judgment proceedings leaves no other conclusion than that:

*ONE:* On January 31, 1961, F. Gregorie & Son was heavily in debt and had no other way of raising funds to save the business than to put up the family residence "OAKLAND" Plantation containing approximately six hundred (600) acres.

*TWO:* Two of its large creditors, Arkansas Fuel Oil Corporation and Carolina Fleets, Inc. were threatening to close down the business and foreclose its mortgage on the business.

*THREE:* The deed and memorandum of agreement Exhibit "A" were executed on the same date.

*FOUR:* The re-purchase right approximated the amount of the total indebtedness of the Gregories.

*FIVE:* The stated consideration for the deed was Thirty-Five Thousand ($35,000.00) Dollars whereas only two years later lots were sold off at a value of approximately Two Thousand ($2,000.00) Dollars per acre, so that the alleged purchase price was totally inadequate when considered as a purchase price but closely approximated the indebtedness when the existing mortgage and the memorandum of agreement are considered.

*SIX:* The basic problem addressed by the parties at the time of the transaction was provision of money to take care of the debts of F. Gregorie & Son to keep it in business, and there is no evidence that the Gregories intended to sell "OAKLAND" Plantation. Mr. Hamlin's testimony is in conflict with other statements made by him in his deposition. Even he does not undertake to state that either the purchase or the price was discussed with the Gregories.

*SEVEN:* Mr. Hamlin had been in the habit of lending the Gregorie family money over a long period of time as a customary thing and knew their necessitous situation.

*EIGHT:* The terms of the agreement to re-convey indicate that the reconveyance was to be made upon payment of the amount of money owed by the Gregories plus interest to the time of repayment.

*NINE:* The memorandum of agreement Exhibit "A" states: "It was agreed that the aforesaid tract of land would simultaneously be conveyed by Ferdinand Gregorie to O. D. Hamlin as security for his additional financial assistance."

I find that the conveyance of "OAKLAND" Plantation on January 31, 1961, which was accompanied with a re-purchase agreement was intended as security for a debt owed by the Gregories to O. D. Hamlin rather than as a deed or sale of the property.

This conclusion was reached by my considering and finding the following:

(1) That there was an existence of debt from Gregorie to Hamlin which debt survived the January 31, 1961 conveyance;

(2) There was a deed, plus a separate agreement, to reconvey the subject property;

(3) There were previous negotiations of the parties which indicated that (a) there was no discussion between the parties as to a sale; (b) there was no discussion between the parties as to price or consideration; (c) Hamlin claims to have purchased "OAKLAND" from a third party which never held legal title; (d) Hamlin never attempted to have the property appraised prior to the sale; (e) there was no contract of sale preceding the conveyance.

(4) The consideration stated as a purchase price was grossly inadequate for the more than six hundred (600) acres of "OAKLAND" Plantation in 1961;

(5) The dealings between the parties were as creditor and debtor;

(6) The terms of the agreement for reconveyance quite clearly set out the intentions of the parties in 1961;

(7) The burden of proof by the Plaintiff has been carried by clear, definite and convincing evidence;

(8) The defense of laches does not apply in this case.

These grounds are discussed in detail below:

## (1) *EXISTENCE AND SURVIVAL OF DEBT*

A strong indicia of whether the purported conveyance was intended as security for a debt or was a sale or deed is reflected by the existence or lack thereof of a debt or liability between the parties either existing prior to the contract or rising from a loan made at the time of the contract whereby the debt is still left subsisting after the transaction in question, *Hamilton v. Hamer,* 99 S. C.

31, 82 S. E. 997. The effect of this existing debt usually turns out to be that the payments stipulated for the agreement to reconvey is in reality the payment of this existing debt, and the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instrument. *Hamilton. (supra.)*

The existence of a debt or liability flowing from Hamlin, the creditor, to Gregorie, the debtor, at the time of the transaction in question is not contested by Plaintiff or Defendant. The Memorandum of Agreement, quite accurately outlines the history of the relationship between Gregorie and Hamlin and the existence of a debt:

"MEMORANDUM OF AGREEMENT made and entered into at Mt. Pleasant, South Carolina, this 31st day of January, 1961, by and between F. GREGORIE, JR., and O. D. HAMLIN, WITNESSETH:

WHEREAS, F. Gregorie & Son, a corporation of which F. Gregorie, Jr. is President, has in recent months *been pressed by certain of its creditors* more particularly by Carolina Fleets, Inc., and Arkansas Fuel Oil Corporation; and

WHEREAS, O. D. Hamlin of Mt. Pleasant, South Carolina , had heretofore assisted F. Gregorie & Son in the financing of its operation; and

WHEREAS, by reason of the aforementioned two said debts, it became *necessary to afford security therefor in the nature of certain mortgages* that appropriate arrangements could be made to pay the amounts due and owing Carolina Fleets, Inc., and Arkansas Fuel Oil Corporation;" (emphasis added)

There is no controversy within the evidence but that a debt existed at the time of the conveyance in January, 1961, and in addition, there is no dispute whatsoever that Hamlin was a substantial creditor at that time, and that once the

transaction in January of 1961 was completed, there was still a debt subsisting thereafter.

The fact that the debt was not extinguished at the time of the subject conveyance, is evident from the mere fact that there was a re-purchase agreement setting out the amount of money necessary to re-purchase the property.

Another factor which relates closely to the continuation of the debt is where the payments stipulated in the agreement to reconvey is approximately the same amount as the amount of the existing debt.

As stated in the Defendant's, Hamlin's, Answer, *Second Defense, III*:

"That Defendant, O. D. Hamlin, under the provisions of that agreement, shown as Exhibit "A" of the Complaint granted to F. Gregorie, Jr., as agent, an option to re-purchase the said tract of land for $79,000.00, payable under certain installment conditions . . ."

The total of Gregorie's indebtedness at the time of the execution of the instrument in question was $79,324.00, and the re-purchase agreement was for $79,000.00.

Deposition of O. D. Hamlin of April 20, 1976:

"A. Well, it was supposed to be purchased at—for seventy-nine thousand dollars, payable on or before January, 1966."

## (2) *DEED PLUS SEPARATE AGREEMENT*

Where a separate instrument is executed as a part of the same transaction as the conveyance, the two instruments are construed together if the writing is in the nature of a conditional sale or a re-purchase agreement. *55 Am. Jur. (2d), Mortgages.*

South Carolina has gone so far in the case of *Francis v. Francis*, 78 S. C. 178, 58 S. E. 804, that the court practically held that the mere fact that a contract to reconvey was executed simultaneously with the deed creates in legal effect

a mortgage. Notwithstanding this rather strong precedent, the better case for comparison is *Stackhouse v. Conerly,* 110 S. C. 161, 96 S. E. 255, which holds that a conveyance accompanied by a re-purchase agreement is a strong circumstance to be considered in the determination between a deed absolute and equitable mortgage.

### (3) *PREVIOUS NEGOTIATIONS OF PARTIES*

As stated in *59 C. J. S. § 40*: "On the question whether a deed absolute in form was intended as a mortgage, it is proper to consider the previous negotiations of the parties, their agreements and conversations and the course of dealings between them prior to and leading up to the deed in question."

In *Mason v. Finley et al.,* 129 S. C. 367, 124 S. E. 780, the following factors are used to determine whether or not a sale was in fact intended:

1. That there was no evidence that the owner desired to sell or that the lender desired to purchase.

2. That during the negotiations nothing was said about a sale of the property.

3. That no price was fixed as a selling value of the property and no discussion along that line was had.

4. That no attempt was made to ascertain the real value of the property upon which a sale would reasonably be based, greater liberality being exercised when a loan was intended.

5. That the grantee made no inquiry as to the value of the land.

The circumstances within the case at bar indicate overwhelmingly that no outright sale was ever contemplated by either party. In all the conversations between Gregorie and Hamlin there is not a word stated between them about buying the property. There was never, at any time, a proposal by the Plaintiff to sell "OAKLAND" Plantation. Instead, Gregorie had attempted to sell the oil distributorship busi-

ness, in an obvious effort to protect his home and "OAK-LAND" Plantation.

Additionally, the testimony is uncontroverted, even in the face of Hamlin's June 5, 1978 Affidavit that he "bought" "OAKLAND", that the sale most certainly was not preceded by an Agreement to sell or by a Contract of Sale.

In fact, a significant aspect of the Gregorie/Hamlin dispute is that Mr. Hamlin makes no pretense of having discussed the purchase of "OAKLAND" Plantation with the Gregories nor did he discuss the price; nor did Hamlin attempt to obtain an appraisal of the property. In short, there was simply no evidence that Hamlin took any of the normal and customary steps which would indicate by any normal construction, that he was "buying" "OAKLAND" Plantation in January of 1961. In addition, there is no evidence that Gregorie ever desired to sell "OAKLAND" or that he ever thought that he was in fact selling it.

It is of particular note that Hamlin contends that he made arrangements to buy "OAKLAND" Plantation from City Services, Inc., or in the alternative, from Arkansas Fuel Oil Company, neither of said companies ever having had legal title to "OAKLAND" Plantation.

Deposition of O. D. Hamlin of April 20, 1976, Page 35, Line 10:

"A. Well, they agreed to sell me the place, and I agreed to buy it.

Q. Okay. You made an arrangement with City Services to buy the place. Is that correct?

A. Yes, that's right.

Q. That was with Mr. Carter, who is the local representative of City Services?

A. Mr. Carter and Mr. Smirker, who was the District Manager at the time."

In addition, the Defendant, Hamlin, indicated that he did not have an appraisal made, nor was he interested in whether or not the lending institution appraised the property.

Deposition of O. D. Hamlin of April 20, 1976, Page 82, Line 13:

"Q. . . . Did you at any time have an appraisal done of the property for your purchase of "OAKLAND" Plantation as you put it?

A. No, sir.

Q. Did the bank, to your knowledge, ever make an appraisal of the property?

A. Yes, sir. I think they did.

Q. What was the value per acre of the property at that time?

A. I don't know what they appraised it at.

Q. You didn't ask?
A. No, sir."

It is interesting to note that the facts are not in conflict that price was not discussed between the parties.

Deposition of O. D. Hamlin of April 20, 1976, Page 83, Line 20:

"Q. Okay. Now, what, if anything, was said in negotiating with Ferd Gregorie, Sr., or Jr. with regard to the price of the land?

A. I don't think there was really anything said with him about it."

## (4) *INADEQUACY OF CONSIDERATION/PRICE*

The basic rule concerning consideration which is followed in South Carolina is set out in *59 C. J. S. Mortgages '§ 41 at p. 77*. "The value of the property is a material circumstance to be considered. Thus, if the consideration passing between the parties, or the amount to be paid by the grantor on exercising his right to repurchase, would be fairly proportioned to the value of the property, if considered as a debt or loan secured by a mortgage thereon, but grossly inadequate if regarded as the price of the land on an absolute sale, this will tend strongly to show that a sale could not have

been intended, but that the transaction should rather be treated as a mortgage."

Obviously, the value of "OAKLAND" Plantation at the time the deed was made is material to the inquiry at hand. Here also, the facts are not in controversy. The subject deed recites the consideration as Thirty-Five Thousand ($35,-000.00) Dollars.

Deposition of O. D. Hamlin of April 20, 1976, Page 40, Line 10:

"A. The total amount owing City Services at the time that they were paid was thirty-nine thousand seven hundred and ninety-one sixty-eight."

It is agreed that "OAKLAND" Plantation contained 601.17 acres of land in 1961 and there is sufficient information from within the records before the Court to establish a reasonable value for the property, inasmuch as in early July, 1963, small lots of land of two acres each began being sold at approximately Two Thousand ($2,000.00) Dollars each.

Deposition of O. D. Hamlin of April 20, 1976, Page 77, Line 14:

"Q. All right, sir. You say you sold lots of land off of "OAKLAND" Plantation. Is that correct?
A. Yes, sir.

Q. Do you remember a sale to Theyman Shelby and a Hessie M. Shelby, July 23rd, 1963?
A. Yes, sir.

Q. In the amount of *two thousand dollars?*
A. Yes, sir."

Using that Two Thousand ($2,000.00) Dollar per two acre figure, the high side of the value of "OAKLAND" Plantation would be Six Hundred One Thousand One Hundred Seventy and No/100 ($601,170.00) Dollars, and cut-

ting the two acres price in half for a conservative figure leaving a low value of Three Hundred Thousand Five Hundred Eighty-Five and No/100 ($300,585.00) Dollars for "OAKLAND" Plantation. The purported deed recited Thirty-Five Thousand ($35,000.00) Dollars as consideration for the purchase and the re-purchase agreement recited Seventy-Nine Thousand ($79,000.00) Dollars.

Taking the lowest figure, the value of "OAKLAND" Plantation less than two years after the transaction in question overwhelmingly demonstrates the inadequacy of the price as recited in the deed. The only reasonable inference therefore, is that the transaction in question could not have been intended as a sale but rather the conveyance was intended to secure Hamlin's debt and was in the nature of a mortgage.

## (5) *DEALINGS BETWEEN PARTIES*

There is, of course, no contradiction in the testimony that the Gregorie family borrowed money from Hamlin in a customary and long-term fashion. As is stated in the Affidavit of W. H. Brockinton, Jr. on Page 1 :

"Deponent did come to understand that this practice (Mr. Hamlin's loaning money to F. Gregorie & Son) was a longstanding one between the Messrs. Gregories and Hamlin, so much that when the joint pressure of the indebtedness (*sic*) the claims of Arkansas Fuel Oil Corporation and Carolina Fleets, Inc., was being applied, Mr. Hamlin was as interested in saving the business as were the Messrs. Gregories."

In addition, another indicia of customary and normal course of dealings which gives aid in determining the intention of the parties is how the contact between the parties to the transaction originated, and if the grantor attempted to borrow money at the inception of the transaction. *Mason v. Finley (supra)*.

The testimony in the instant case reveals that the origin of the transaction in question in January, 1961, was a direct result of Gregorie making application for a loan to both First National Bank and to Hamlin. The difference in this case, of course, is that a third-party lending institution was contacted from which to borrow money; but it was done jointly with Hamlin, and in addition, Hamlin himself was responsible for advancing additional funds to pay off the two major pressing debts of Arkansas Fuel Oil Company, Inc. and City Services, Inc.

Clearly, the negotiations between Gregorie and Hamlin or, at least the discussions between the two, had their origin in the nature of a request to borrow monies to pay the creditor and Gregorie made the request to both Hamlin and to the First National Bank. Hamlin, in fact, later advanced monies and co-signed the note with the First National Bank.

The application by Gregorie was for a loan, and all the negotiations which were conducted were with respect to the form of the security upon the premises in question; and Gregorie at no time made any pretense that he would have sold "OAKLAND" Plantation for the sum actually advanced by Hamlin or for five times that amount. There is simply not a word anywhere that suggests a sale in any logical application of the facts in evidence.

It is not open to question that the relationship between Gregorie and Hamlin was one of lending and borrowing when one considers and applies the rules as set down in *Mason, (supra)*, re-affirmed in *Thomas v. Bartell*, 261 S. C. 531, 201 S. E. (2d) 243 (1973); and in *Britton v. Amos*, 241 S. C. 336, 128 S. E. (2d) 161 (1972). This relationship shows that where the parties had the only negotiation which preceded the execution of the deed and it was a discussion requesting a loan; the mortgagee-mortgagor relationship was not broken by a new negotiation for a sale, because the initial request for a loan will be presumed to have continued clear through the consummation of the transaction.

The South Carolina Supreme Court has held that a *new relation* of the proposed buyer and seller, once intervened, must be shown in order to sustain a sale, once the transaction was initiated by an application for a loan. *McHall v. Hall,* 41 S. C. 168, 19 S. E. 307. *Brown v. Bank,* 55 S. C. 51, 32 S. E. 816.

> I find there was no additional consideration which would change the nature of this instrument from a mortgage.

### (6) *TERMS OF THE CONTRACT FOR CONVEYANCE*

The terms of the contract for reconveyance in the instant case overwhelmingly indicate that Hamlin simply did not consider that he had an outright deed until after he considered Gregorie to be in default in payment. This, of course, is gleaned from the January 31, 1961 date of execution of the deed and the March 2, 1963 time of recording the said deed as has been discussed *infra.*

In reviewing the language used in several cases, such as *Mason v. Finley, (supra),* and *Brownlee v. Martin, (supra),* wherein the significant language concerning the re-purchasing agreement is as follows:

(1) "I hereby agree to reconvey to "Plaintiff" by a Quit-Claim Deed, the land which she deeds to me of even date herewith, provided she pays me One Hundred and No/100 ($100.00) Dollars and eight (8%) percent interest thereon from this date by November 15, 1910, or any time previous to the above date, but it is expressly understood that if the payment of the above amount is not made by November 15, 1910, that this agreement is null and void, and that the deed executed by her of even date herewith is a straightout warranty deed and not a conditional deed or mortgage." *Mason, (supra).*

(2) "If the payment of the above amount is not made by November 15, 1910, that the agreement is null and void, and

that the deed executed by her of even date herewith (will be a straightout warranty deed and not a conditional deed or mortgage)." *Brownlee,(supra)*.

The aforementioned cases having considered that language the Court found that there was in fact no deed, but rather the conveyance was in fact an equitable mortgage for the securing of a debt.

Significantly, both cases point to those sections of the repurchase clause which sets a deadline whereby if the money owed is not paid by that time, then the creditor claims to have an absolute fee-simple title. The significant point made is "why is such a stipulation necessary if one already has such title under the absolute deed received from the Grantee?" As was held in both the *Mason* and *Brownlee* cases such stipulations must have been deemed necessary because they felt that the deeds were not what they appeared to be, but were merely mortgages with the right of redemption on the part of the Grantee.

The intention of Hamlin at the time of the transaction has been shown convincingly that a sale was not contemplated. Even Hamlin's testimony in his Affidavit of June 5, 1978 reflects that he would only purchase "OAKLAND" Plantation *if the Gregories desired same.*

Affidavit of O. D. Hamlin, Page Four, Paragraph Two, Sentence Three:

"Deponent advised U. H. Brockinton and Ferd Gregorie that *if the Gregories desired,* he would purchase "OAK-LAND" for an amount to be agreed upon, pay debt to Arkansas Fuel Oil Corporation, participate in operation of the business and finance the business." (Emphasis added.)

There could be no stronger statement of Defendant's Hamlin's intention, and as such, it could *not* possibly have supported the assertion that the deed absolute on its face was in reality a sale.

In addition, Hamlin asserts in another portion of his June 5, 1978 Affidavit, Page Three, Paragraph Three, Sentences One and Two:

"Deponent is a farmer, knew the property known as 'OAKLAND', and was in the market for a purchase of additional farm land. Deponent desired to buy 'OAKLAND' *if it were to be foreclosed upon by Arkansas Fuel Oil Corporation.*" (emphasis added)

The evidence is that Arkansas Fuel Oil Corporation's mortgage on "OAKLAND" Plantation (but not other personal obligation notes) was satisfied on October 31, 1960 and recorded in the R. M. C. Office for Charleston County on November 1, 1960. Inasmuch as there is no public record filed which has ever named either of these creditors as having title to "OAKLAND" it therefore was a legal impossibility for Arkansas Fuel Oil Corporation to sell "OAKLAND" Plantation in 1961. This also defeats the only contingency, other than the consent of the Gregories by which Hamlin asserts he would purchase "OAKLAND" Plantation. Hamlin maintained in his June 5, 1978 Affidavit that he would purchase "OAKLAND" for an "amount to be agreed upon". According to his own testimony and the pleadings of Gregorie, no amount had been agreed upon or had ever been discussed.

### (7) *BURDEN OF PROOF*

In *Shiver v. Arthur,* 54 S. C. 184, 191, 32 S. E. 310, 312, 313, the firm rule in South Carolina regarding burden of proof in actions to declare an absolute deed a mortgage is stated:

"(1) An instrument of writing is what upon its face it purports to be.

(2) The complaint must contain the necessary allegation that the deed, though absolute on its face, was intended as a mortgage.

(3) This allegation must be sustained by testimony prima facie showing that it is true. When this is done, it removes the presumption arising from the fact that a paper is presumed to be what its face imports.

(4) When this is done, it is incumbent on the mortgagee to remove the inferences that may be drawn from such prima facie showing. This is sometimes spoken of as the burden of proof, but it is simply making it incumbent on the mortgagee to disprove the case as then made."

Gregorie has established the transaction as being security for the debt to Hamlin in the way of an equitable mortgage by clear, specific, definite, and convincing evidence; this showing was more than the presentment of a *prima facie* case sufficient to initiate presumptions as to the nature of the instruments, the magnitude of the overwhelming evidence is sufficient by itself to declare the deed absolute in form as an equitable mortgage as a matter of law.

Having found the deed to be an equitable mortgage by close examination of the evidence, the subsequent dealings and transactions between Gregorie and Hamlin did not change the nature of the transactions: "Once a mortgage, always a mortgage." unless there is additional consideration for any change made; *Leland v. Morrison (infra)*. There of course is absolutley no evidence whatsoever of such additional consideration.

*McHall v. Hall,* 41 S. C. 168, 19 S. E. 307, (1894), supports this view inasmuch as it established that a transaction which was originally intended as security shall never be turned into an absolute conveyance.

## (8) *DEFENSES*

The last contention which need be addressed is the issue of laches raised by Hamlin in his Answer.

In *Leland v. Morrison,* 92 S. C. 501, 512-513, 75 S. E. 889, the rule of laches or lapse of time is clearly presented:

"Delay in ascertaining an absolute deed to be a mortgage has not the same effect upon the rights of the parties that attends delay in seeking to enforce in equity the performance of an executory contract. Once a mortgage, always a mortgage, is the maxim of the law and payment does not stand on the footing of performance in equity.

The character of the deed being fixed by the evidence as conditional the mortgagor has the same time to make payment that any other debtor has. *The right to foreclose and the right to redeem are reciprocal, and if one is barred the other is also barred."* (emphasis added)

There is no doubt that where a deed, though absolute in form, is shown to be intended as a security for the payment for a debt, it *will always remain a security until foreclosed by some judicial proceeding,* or unless the party deprives himself of the interest he has in the property by some subsequent conveyance or relinquishment of interest." (emphasis added)

The *Leland* case goes further and states that under the law of South Carolina, "the life of a mortgage is 20 years. Any time during that period, the owner of it has the right to foreclose it; and if the statute of limitations does not bar the right to foreclose it would not bar the right to redeem."

Inasmuch as the judgment of this Court is that the ■ conveyance or transaction is now, and from its inception has been a mortgage, the defense of laches immediately falls.

Gregorie's actions were reasonable under the circumstances. The testimony reflects that the first Notice given

by Hamlin of his ownership claim was in 1974, the same year in which this suit was commenced.

I find that the instruments executed on January 31, 1961 were intended as security for a debt and by Gregorie and Hamlin rather than as a sale or absolute conveyance of the property known as "OAKLAND" Plantation, Now Therefore,

IT IS ORDERED, ADJUDGED AND DECREED that the Deed dated January 31, 1961, from Ferd Gregorie to O. D. Hamlin is hereby declared to be a Mortgage now and as of the date of its execution and

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that this cause be referred to the Master-in-Equity for Charleston County, the Honorable Louis E. Condon, to take an accounting and report to this Court the amount due to the Defendant, Hamlin, by the Plaintiff, Gregorie. In making up said accounting, either party to the cause is hereby permitted to show the amount due by the Plaintiff on the said indebtdeness; and said Master is further directed in making said accounting to ascertain the appropriate set-off and credits attributable to both parties, interest and/or abatement of interest, and to determine what taxes and other expenses or improvements, if any, be attributable to either party.

UPON completion and submission of the Master's Report; and the confirmation thereof, the Circuit Court shall give Judgment in favor of Hamlin, against the other parties Plaintiff and Defendant for the amount thus found to be due; and the Circuit Court shall affix a reasonable time thereafter in which the other parties, Plaintiff and Defendant shall have to pay that sum to Hamlin; and, if such payment is not made, the Circuit Court shall issue its Decree or Foreclosure and Sale of the equitable Mortgage of said tract, known as "OAKLAND" Plantation, in the usual form of foreclosure and barring the equity of redemption.

AND IT IS SO ORDERED.

Ness, Justice (dissenting) :

Concluding that a genuine issue of material fact exists, I would reverse and remand for the taking of testimony.

Respondents Gregorie, *et al.* brought this action to declare a 1961 deed from the late Ferdinand Gregorie, Sr. to appellant Hamlin a mortgage. Appellant denied the deed was intended to be a mortgage, and unequivocally stated in his deposition (Tr. 60) and in his affidavit (Tr. 197) that he "bought" the disputed property in fee simple absolute.

It is well settled that in order to convert an apparent deed into a mortgage, the proof must be clear and convincing. *Arnold v. Mattison*, 3 Rich. Eq. 153 (1850); *Thomas v. Bartell*, 261 S. C. 531, 201 S. E. (2d) 243 (1973). Moreover, in order to warrant the granting of summary judgment, no genuine issue of any material fact may exist. *The venot v. Commercial Travelers Mutual Accident Association of America*, 259 S. C. 235, 191 S. E. (2d) 251 (1972). We recently stated in *Lunsford v. McDaniel*, S. C., 252 S. E. (2d) 917 (1979), that a motion for summary judgment should only be granted "when it appears from the pleadings, depositions, and affidavits that there is no genuine issue of material fact." Here, the affidavit and deposition of appellant Hamlin place the construction of the 1961 instrument in direct controversy. Therefore, summary judgment was premature and improper.

I would remand.